Dennis M. Moskal, Esq.
LAW OFFICES OF DENNIS M. MOSKAL, LLC
500 Grant Street, Suite 2900
Pittsburgh, PA 15219
(412) 278.7401, Direct
(412) 992.0948, Mobile
(412) 927.1147, Facsimile
dennis@harassment-doctor.com
*Counsel for Plaintiff*

_____

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

L. G.,

    Plaintiff,

v.

ARMSTRONG COUNTY MEMORIAL HOSPITAL

    Defendant.

CASE NO. _____

**JURY TRIAL DEMANDED**

**COMPLAINT IN CIVIL ACTION**

    Plaintiff, L. G., by and through her legal counsel, Dennis M. Moskal, Esq., files the following Complaint against Defendant, ARMSTRONG COUNTY MEMORIAL HOSPITAL, and avers as follows:

**THE PARTIES**

    1.    Plaintiff, L. G. (hereinafter "Plaintiff"), is an adult individual, who resides in Brookville, Pennsylvania 15825.

    2.    Defendant, ARMSTRONG COUNTY MEMORIAL HOSPITAL, is a Pennsylvania Hospital in Armstrong County with offices located at 1 Nolte Drive, Kittanning, Pennsylvania 16201.

    3.    Defendant-Employer employs approximately one-thousand employees at the hospital.

## JURISDICTION

4. The jurisdiction of this court is invoked pursuant to the Americans with Disabilities Act of 1990, 42 U.S.C. §12101 et sq., Family Medical Leave Act of 1993, 29 U.S.C. §2601, et seq. and 28 U.S.C. 1331, 1343 and 1345, and upon the doctrine of pendent and/or supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. §1367.

5. Plaintiff has satisfied all the procedural and administrative requirements.

## Plaintiff Commences Employment at Hospital

6. In January 2008, Plaintiff commenced her employment at Armstrong County Memorial Hospital (hereinafter "ACMH") as a part-time nurse practitioner.

7. At the time of her hire, Plaintiff had an impeccable educational background with a Bachelor of Science in Nursing at Pennsylvania State University (graduating 1985) and a master's degree in Nursing at University of Pittsburgh (1995). She also had considerable experience. From July 1995 to January 2002, she worked on a full-time basis at Brookville Hospital, whereby she was promoted to Vice President for Patient Care Services at Brookville. She remained in that role until January 2007.

8. Under Medicare and third-party medical insurance coverage, physician services, including the services of CRNPs are measured in Relative Value Units ("RVUs"). Plaintiff was expected to generate 2,400 RVU's per contract year or 600 RVU's per quarter. If she exceeded that amount, she was entitled to a productivity bonus.

9. In 2011, the threshold to trigger the productivity bonus was reduced to 1,850 per contract year to be determined on a quarterly basis.

10. Plaintiff consistently met the 'original' RVU goals and was consistently getting bonuses every quarter.

## Plaintiff's Ongoing Problem with Migraines

11. In February 2016, Plaintiff first noticed that she was having daily migraines that were not being relieved by any available medication. She had a sensitivity to light and sound and had nausea without vomiting.

12. At this point, Plaintiff mistakenly believed that everyone that worked hard would get the same types of headaches such as from stress, lacking sleep, eye strain or working too much.

13. After a couple weeks of constant daily headaches, Plaintiff decided to speak to Dr. Chad Shaffer at ACMH's South Bethlehem Primary Care Center, advising him that she was having daily headaches for a few weeks long.

14. In response, Dr. Shaffer had blood work done.  He also requested her to increase her fluid-intake, decrease caffeine, consider massages, and take daily multi-vitamins.  He also suggested her to decrease the screen brightness on the laptop that she carries around during the day.  Dr. Shaffer did not prescribe any medication.

15. In March 2016, Plaintiff's bloodwork showed indicia of inflammation, and so, Dr. Shaffer ordered a steroid pack, which had an initial positive reaction in the first couple days.  This initial positive reaction quickly subsided.

16. After a couple months under Dr. Shaffer's informal guidance, Plaintiff saw Dr. Shaffer in April 2016 as an actual patient.  At this time, he prescribed 25 mg. Topamax, which is an anti-seizure medication, but that also helps migraine sufferers.

17. After a couple informal discussions, the frequency of Plaintiff's headaches continued albeit the intensity had slightly decreased.

18. The Topamax was increased to 50 mg in dosage on June 1, 2016.  Dr. Shaffer also said for her to try Indocin as needed.  Each time Plaintiff took the Indocin, she was nauseated and had epigastric pain, and so, she was told to stop the Indocin.

19. On June 4, 2016, Plaintiff went on vacation with her husband and children.  Upon waking up the second morning in a house she rented, she was alarmed to find that her whole body was numb and tingling, although she could move.

20. Plaintiff texted her concerns to Dr. Shaffer that morning, who responded that she should wean off of the Topamax over the course of a week.

21. When she came back to work, she was to try Inderal, 20 mg. twice a day once she was off the Topamax.

22. At this point, due to the consistency of her migraines, Dr. Shaffer decided to refer her to a neurologist.  He suggested a couple of names, and Plaintiff decided to go with the office that could see her the soonest, The Headache Center at University of Pittsburgh Medical Center's Department of Neurology.  Dr. Barbara Vogler gave Plaintiff an initial exam on June 30, 2016.

23. Dr. Vogler discussed the current situation and said to Plaintiff that she could not increase the Inderal to a high enough dosage to obtain positive effects with the migraines due to

the effect of the medication on Plaintiff's pulse. Instead, she prescribed 25 mg of Zonegran, which Plaintiff was to increase each week by 25 mg until she got to 100 mg. She also prescribed 100 mg of Imitrex to be taken as needed. Finally, she did a six-day course of Decadron, which is a steroid.

24.     Plaintiff would see Dr. Vogler a total of three times. Because she was out of network with Plaintiff's insurance, she would consistently communicate with Vogler by email when necessary with updates as to her condition and relate how the medications were working.

25.     Dr. Vogler did order an MRA/MRV of the head sometime in January of 2017, which looks for blood-clots or abnormalities in the arteries or blood vessels. In February 2017, Plaintiff had the MRA/MRV.

### Hospital Requests Modification of Medical Provider's Schedule

26.     On January 31, 2017, the physicians in the various primary care centers were sent a letter that they needed to increase their office hours and availability.

27.     Plaintiff was never sent the January 2017 letter, and she only knew about the letter because Dr. Chad Shaffer had advised Plaintiff that he had received such a letter.

28.     On February 8, 2017, Plaintiff was informally told by Callie Karaica, Director of Physician Practices, at a staff meeting that all full-time medical providers had to work five days a week.

29.     Plaintiff asked Callie, "What if we cannot switch our schedule to five days?" At this point in time, Plaintiff advised Callie that because of her chronic daily migraines, she could not make the switch. Callie said she did not have an answer, but that Plaintiff would have to check with Dr. Harold Altman, Chief Medical Officer. Plaintiff immediately called and left a message that day for Dr. Altman.

### Remaley's Heartless Response to Plaintiff

30.     After leaving a voice message for Dr. Altman, Plaintiff then called Anne Remaley, Vice President of Human Resources, sometime after lunchtime.

31.     When Remaley called Plaintiff back, Remaley had already known about Plaintiff's remarks to Callie that she could not work five days. Very coldly, Remaley said, "Tell us about these so-called headaches that we never heard about before." Meanwhile, Plaintiff's condition is all through the office records with substantial documentation. Remaley added, "You aren't special, and you are only trying to get out of working Fridays."

32. Plaintiff thought the entirety of the response was horrible, unprofessional and insensitive. The response was so insensitive that Plaintiff knew she was in for some trouble with the company and immediately wrote down exactly what she said.

### Defendant Refuses to Continue Plaintiff's Four Day Schedule

33. Dr. Altman asked Plaintiff to get back to him with a 'proposal' of what she could do as to schedule.

34. On February 9, 2017, Plaintiff emailed Dr. Altman, stating, in part, "I am happy to continue to work the previously requested and agreed upon full-time schedule of 36 hours as I currently work (Monday, Tuesday, and Thursday from 8 AM to 5 PM and Wednesday from 8 AM to 7 PM)." "If the above is no longer acceptable, then I will reduce to a part-time employee working a part-time schedule. My availability is Tuesday from 8 AM to 5 PM, Wednesday from 8 AM to 7 PM and Thursday from 8 AM to 5 PM."

35. At all times relevant, Plaintiff made it clear that she could continue the four-day week and/or work a set part-time schedule.

36. Defendant through its authorized agents and representatives refused to continue Plaintiff's "four-day work week."

37. On February 28, 2017, at a meeting between Plaintiff, Dr. Altman and Anne Remaley, Dr. Altman suggested that Plaintiff change neurologists. Plaintiff responded that it was her intention to do so, and in fact, she did change neurologists to Dr. Bradley Torphy of Diamond Health Clinic.

### Plaintiff Informed of Schedule Changes

38. On March 1, 2017, Plaintiff was advised by Defendant about the changes in schedule, which included one work day per week on alternate weeks starting at noon and ending at 8 p.m., and a regular work week of at least 4.5 days in the office.

39. At the time of the request, Plaintiff started work at 8 a.m. every day. She was done on Monday, Tuesday and Thursday at 5 p.m., and Wednesday at 7:00 p.m. On Friday, Plaintiff was off.

40. At the time of the request, Plaintiff was able to successfully perform her job with exceptional RVU's and without any accommodations.

41. On February 17, 2017, Plaintiff had tried a five-day week.

42. At that time, Dr. Shaffer and Marcy Monrean (Physician's Assistant) were both scheduled off. Plaintiff had agreed to work a fifth-day for that particular week to cover for them.

43. After arriving that morning, Plaintiff's headache increased from its #3-#4 baseline pain to #9-#10 pain in just an hour. As a result, she took Imitrex, turned the lights out in her office, used her computer as little as possible, stayed in the office as much as possible, and stayed to endure the migraine pain. Her experience confirmed that she could not do it every week.

### Plaintiff's Option for Part-Time

44. Plaintiff also discussed a move to part time status; however, Defendant informed her that the hospital policy for part time employment requires that the individual work a schedule determined by the employer's needs and does not guarantee any particular day or days off.

45. Plaintiff needed to know what days she was working and the number of hours to manage her migraines with medication. If she did not have specificity in her schedule, she would not know in advance, and would not be able to plan a potential as needed medication schedule.

46. In its failure to give Plaintiff a set part-time schedule, Plaintiff was treated differently in the terms and conditions of her employment than a similarly situated female employee who was not disabled but who had a set schedule that did not vary nonetheless.

### Plaintiff's Constructive Termination

47. Defendant advised Plaintiff on Monday, March 6, 2017 that she either accept the full-time schedule or convert to a part-time schedule to be determined each week by the needs at the South Bethlehem location. They added that if they did not hear from her within twenty-four hours, they would consider her as resigning and starting to work out a 90-day notice.

48. At no time did Plaintiff refuse to work on any particular day, such as Fridays; rather, she made it clear that she could not work five days in a row due to physical limitations of which Dr. Shaffer and Veronica Stubrick, Office Manager, were fully cognizant.

49. The Americans with Disability Act contemplates an ongoing dialogue between employer and employee, whereby the employment relationship is kept intact.

50. As a member of management, Remaley's voice is the voice of the Hospital. Remaley's remarks are in stark contrast to how employees should be treated. She abruptly cut off the dialogue between employer and employee and with a pronounced coldness.

51. Plaintiff was officially terminated as an employee effective June 4, 2017.

**Plaintiff's Requests for FMLA Leave**

52. Prior to Plaintiff's termination, Plaintiff had requested FMLA paperwork on February 14, 2017.

53. Prior to Plaintiff's termination, Dr. Vogler at Plaintiff's February 15, 2017 face to face appointment had advised Plaintiff that she would complete FMLA paperwork so that Plaintiff would have the appropriate documentation to call off if necessary. Plaintiff requested the FMLA paperwork from her office again on February 15, 2017.

54. On February 17, 2017, FMLA papers were faxed to Dr. Vogler's office for completion.

55. Vogler completed the FMLA paperwork March 1, 2017, and submitted it to Heidi Clinger, who Plaintiff was aware received it since she met with Clinger about it after she received it. Plaintiff received a copy of the FMLA paperwork via mail from Vogler.

56. Clinger gave Plaintiff a copy of the FMLA policy, showing how she would use it to call off.

57. Clinger never advised Plaintiff that she needed to do anything further to apply for FMLA, and at all times relevant, Plaintiff believed she completed all the FMLA paperwork necessary to obtain FMLA; she never heard anything to the contrary from anyone at the hospital.

**COUNT I – DISABILITY DISCRIMINATION IN VIOLATION OF THE AMERICANS WITH DISABILITY ACT (ADA)**

58. Plaintiff incorporates paragraphs 1 through 57 as if fully set forth herein.

59. In March 2017, Plaintiff was a qualified individual with a disability who could perform the essential functions of her job with or without reasonable accommodations and so is within the protections of the Americans with Disabilities Act of 1990, 42 U.S.C. §12101 et sq. (hereinafter "ADA").

60. Defendant-Employer discriminated against Plaintiff in the terms, conditions and privileges of her employment because of her disability, in violation of the Americans with Disabilities Act.

61. The Americans with Disabilities Act envisions an ongoing interactive dialogue, consisting of multiple meetings.

62. Defendant-Employer refused to engage in an ongoing dialogue with Plaintiff, despite knowing that she had applied for FMLA and was in the process of getting a new neurologist.

63. Plaintiff was not being treated in the same manner as a female that was not disabled, who was given a set part-time schedule as opposed to the variable schedule offered to Plaintiff. Additionally, while the hospital would require Plaintiff to be available to work hours beyond a usual part-time schedule to cover call offs, sick time, and vacation time, the other female was not required to do so.

64. Defendant-Employer's violation of the Civil Rights Act was undertaken with malice or reckless indifference to her federally protected right to not be discriminated against because of her disability.

65. As a direct and proximate result of Defendant-Employer's unlawful and discriminatory constructive termination, she has suffered pecuniary losses including in the form of lost pay, wages and benefits, overtime, holiday pay, clothing allowance, vacation, sick and personal days, medical benefits, dental and vision benefits.

66. As a direct and proximate result of Defendant-Employer's unlawful and discriminatory constructive termination, she has suffered extreme emotional distress, depression, stress, anxiety, emotional pain, suffering, inconvenience, mental anguish, embarrassment, humiliation, loss of enjoyment of life, and other non-pecuniary losses.

### COUNT II – INTERFERENCE WITH FMLA RIGHTS
### 29 U.S.C. §2601, et seq.

67. Plaintiff incorporates paragraphs 1 through 66 as if fully set forth herein.

68. Plaintiff was in the process of attempting to exercise rights given to her under the Family Medical Leave Act of 1993, 29 U.S.C. §2601, et seq. (hereinafter "FMLA").

69. In its failure to designate any FMLA leave, and its blatant unlawful interference with, restraint, and denial of the exercise of, and/or Plaintiff's attempt to exercise rights provided under the FMLA, Defendant-Employer was in violation of the Act.

### COUNT III – RETALIATION FOR ASSERTING FMLA RIGHTS
### 29 U.S.C. §2601, et seq.

70. Plaintiff incorporates paragraphs 1 through 69 as if fully set forth herein.

71. Plaintiff was in the process of attempting to exercise rights given to her under the Family Medical Leave Act of 1993, 29 U.S.C. §2601, et seq. (hereinafter "FMLA").

72. Defendant-Employer retaliated against Plaintiff in the terms, conditions and privileges of her employment because of her protected activity as set forth above, in violation of the FMLA.

73. Defendant-Employer's intent in discharging her from her employment was to retaliate for Plaintiff's exercise of her rights under the FMLA, and that the discharge was in violation of the FMLA.

74. As a direct and proximate result of Defendant-Employer's unlawful and discriminatory termination, she has suffered pecuniary losses including in the form of lost pay, wages and benefits, overtime, holiday pay, clothing allowance, vacation, sick and personal days, medical benefits, dental and vision benefits.

75. As a direct and proximate result of Defendant-Employer's unlawful and discriminatory termination, she has suffered extreme emotional distress, depression, stress, anxiety, emotional pain, suffering, inconvenience, mental anguish, embarrassment, humiliation, loss of enjoyment of life, and other non-pecuniary losses.

### COUNT IV – VIOLATIONS OF PENNSYLVANIA HUMAN RELATIONS ACT
### 43 P.S. §951-963

76. Plaintiff incorporates paragraphs 1 through 75 as if fully set forth herein.

77. Plaintiff, as an individual who was disabled at the time of the incidents in question, is a member of a protected class.

78. Defendant-Employer discriminated against Plaintiff in the terms, conditions and privileges of her employment because of her disability, in violation of the Pennsylvania Human Relations Act ("PHRA").

79. Plaintiff was subject to adverse employment action, including an unwarranted constructive termination.

80. Defendant-Employer's violation of PHRA was undertaken with malice or reckless indifference to her state protected right to not be discriminated against because of her protected status.

81. As a direct and proximate result of Defendant-Employer's unlawful and discriminatory constructive termination, she has suffered pecuniary losses including in the form

of lost pay, wages and benefits, overtime, holiday pay, clothing allowance, vacation, sick and personal days, medical benefits, dental and vision benefits,

82. As a direct and proximate result of Defendant-Employer's unlawful and discriminatory constructive termination, she has suffered extreme emotional distress, depression, stress, anxiety, emotional pain, suffering, inconvenience, mental anguish, embarrassment, humiliation, loss of enjoyment of life, and other non-pecuniary losses.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully demands as follows:

a. That the Court find that Defendant-Employer's actions are unlawful and in violation of the Civil Rights Act;

b. That Defendant-Employer be ordered to reinstate Plaintiff contingent that it can be done so she has no contact with the discriminating individuals retroactive to the date she was terminated with all benefits incident thereto, including but not limited to wages, benefits, training and seniority;

c. That Defendant-Employer be required to compensate Plaintiff for any wages, vacation pay and benefits owed, but not paid, at the time of separation from her employment;

d. That Defendant-Employer be required to compensate Plaintiff for the full value of wages, both regular and overtime, vacation pay and benefits she would have received from Defendant-Employer had it not been for Defendant-Employer's unlawful actions, including her involuntary separation and/or constructive termination;

e. That Defendant-Employer be required to compensate Plaintiff with front-pay;

f. That Defendant-Employer be required to reimburse Plaintiff for lost pension, social security, experience, training opportunities and other lost benefits from her separation date with Defendant-Employer;

g. That Defendant-Employer should be required to reimburse Plaintiff for all her medical, dental and prescription expenses she incurred as a result of Defendant-Employer improperly separating her from her job and cutting off from her benefits at a time when she most needed medical, dental and prescription benefits;

h. That Defendant-Employer be required to compensate Plaintiff for any and all other pecuniary losses she incurred due to Defendant-Employer's conduct;

i. That Defendant-Employer should pay Plaintiff compensation for all her pain and suffering, including the extreme emotional distress, depression,

stress, anxiety, emotional pain, suffering, inconvenience, mental anguish, embarrassment, humiliation, loss of enjoyment of life, and other non-pecuniary losses that resulted from its improper discriminatory actions;

j. That Plaintiff be awarded exemplary and/or punitive damages due to Defendant-Employer's clear discriminatory conduct;

k. That Plaintiff be awarded against Defendant-Employer the costs and expenses of this action and any further action, including all reasonable attorneys fee as provided by statutes;

l. That a final judgment in favor of Plaintiff and against Defendant-Employer be entered for liquidated damages in an amount that includes the amount of wages due and owing and all other damages as set forth above;

m. That Defendant-Employer be enjoined from discriminating against Plaintiff in any manner that violates her civil rights;

n. That Plaintiff is granted such further legal and equitable relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Respectfully submitted,

/s/Dennis M. Moskal
Dennis M. Moskal, Esq./jmj
PA I.D. # 80106

Law Offices of Dennis M. Moskal, LLC
500 Grant Street, Suite 2900
Pittsburgh, PA 15219
(412) 278.7401, Direct
(412) 992.0948, Mobile
(412) 927.1147, Facsimile
dennis@harassment-doctor.com